351 F.2d 956
 WUNDERLICH CONTRACTING COMPANY, a Nebraska Corporation, Curlett Construction Company, a California Corporation, and Chas. H. Thompkins Company,[1] a District of Columbia Corporation
v.
The UNITED STATES.
 No. 286-58.
 United States Court of Claims.
 October 15, 1965.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Elliott Lee Pratt, Salt Lake City, Utah, for plaintiffs. Allan E. Mecham, Clyde, Mecham & Pratt, Salt Lake City, Utah, and Harold A. Slane, Los Angeles, Cal., of counsel.
 James F. Merow, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant. Edwin J. Reis, Washington, D. C., of counsel.
 Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.
 COWEN, Chief Judge.
 
 
 1
 Plaintiffs, Wunderlich, Curlett & Tompkins, a joint venture, bring this action in their own behalf as general contractor, and on behalf of several of their subcontractors, to recover certain sums alleged to have been lost in constructing a hospital project for the Veterans Administration. On March 13, 1950, plaintiffs entered into a contract with defendant to erect a 500-bed neuro-psychiatric-tubercular hospital complex in Salt Lake City, Utah, in accordance with detailed and highly technical plans, specifications, and drawings, for a consideration of $7,898,000. Under the terms of the agreement, plaintiffs were required to complete performance of the project within 540 days after receipt of notice to proceed, and the completion date was originally fixed as October 20, 1951. In fact, though, the work was delayed for various reasons, and performance was not actually finished until September 2, 1952, some 318 days in arrears. Plaintiffs were not assessed liquidated damages by defendant for the delays, as they had been granted extensions of time sufficient to cover the entire period by which the actual performance time exceeded the original contract time.
 
 
 2
 Plaintiffs' claims for relief here are predicated upon three major, alternative theories: (1) damages for breach of contract — based upon the allegation that defendant knowingly furnished plaintiffs with defective plans and specifications which were substantially incomplete, ambiguous, and impossible of performance; (2) quantum meruit, to reimburse plaintiffs for their reasonable costs incurred in performing the work — based upon the contention that defendant ordered an unreasonable number of changes and modifications in the plans and specifications after the work had begun, the cumulative effect of which resulted in a fundamental alteration of the scope of the contract and the construction of a hospital substantially different from that originally contemplated by the parties, and (3) equitable adjustment under the Suspension of Work article of the contract, to compensate plaintiffs for the costs of actual delays incurred — based upon the assertion that the plans and specifications were allegedly so inherently ambiguous and inadequate and the changes ordered so extensive, that defendant should in all fairness have stopped the work in order to make corrections and prevent unnecessary delay and expense in the contractor's performance.
 
 
 3
 On December 16, 1946, defendant (by and through the Army Corps of Engineers) engaged an experienced Salt Lake City architectural firm to prepare necessary reports, designs, drawings, and specifications incident to the construction of the proposed 14-building hospital complex for the Veterans Administration. Because the anticipated project was to be the largest high-class construction venture ever undertaken in Salt Lake City, and because no prototype of the proposed facility existed anywhere in the United States, the architectural firm encountered serious difficulties in the performance of the design contract. Months were spent in studying various hospital designs and modern hospital techniques, and a great deal of cooperative effort was necessitated among the Veterans Administration, the Corps of Engineers, and the architects in order to produce a coordinated set of plans that would satisfactorily fulfill the requirements of the Administration. Work on the drawings was further complicated by the fact that the quality of design in the early post-war years was not as high as is now expected. During World War II, qualified draftsmen and engineers had been absorbed in great numbers into the armed services, and in the post-war years a severe shortage of personnel continued, due to the necessity of having to retrain previously qualified servicemen and to the great competitive demand for skilled technicians by both industry and government.
 
 
 4
 During the preparation of the pertinent plans and specifications, defendant, through the offices of the District Engineer, Division Engineer, Chief of Engineers, and the Veterans Administration, repeatedly reviewed submissions and resubmissions of the architect, making numerous and detailed comments, criticisms, corrections, and changes in design. Serious conflicts arose at times among the different personnel involved over various aspects and details in the plans, and conferences were arranged with the Chief of Engineers in Washington, D. C., to resolve points of difference.
 
 
 5
 When the final working drawings, as amended and modified, were eventually submitted, on May 25, 1949, the architectural firm realized that a substantial number of discrepancies remained which had not been satisfactorily resolved by corrections on the relevant documents. The Corps of Engineers, too, was cognizant of certain inadequacies and discrepancies in the final drawings, but because of the great need of the Veterans Administration for the hospital, did not require further corrections to be made prior to bidding. It decided rather to leave such outstanding matters for handling as field problems in the subsequent construction of the project.
 
 
 6
 The hospital project was then advertised for bids on December 16, 1949, and the date for submission and opening of bids scheduled for February 16, 1950. On January 24 and 25, 1950, a pre-bid conference was held in Salt Lake City, with the District Engineer of the Corps of Engineers presiding and two partners of the architectural firm in attendance. Several prospective bidders and material suppliers attended and were invited to make comments and criticisms on the plans. The existence of many errors, omissions, and discrepancies in the plans and drawings for the project would have been obvious to any competent person who examined them, and in the course of the proceedings several mistakes were brought to the attention of defendant and were later corrected by addenda. Although plaintiffs were present at this meeting, they did not comment at the time on any of the apparent deficiencies and errors in the documents.
 
 
 7
 The trial commissioner to whom this case was referred has fouud that performance of the project within the 540 days specified in the contract could only have been accomplished under ideal conditions. Under Rule 66 of this court the findings of the commissioner are presumptively correct and can be overcome only by a strong affirmative showing by plaintiffs to the contrary. Dodge Street Building Corp. v. United States, Ct.Cl.1965, 341 F.2d 641, 644-645; Wilson v. United States, 151 Ct.Cl. 271 (1960); Robert E. Davis et al. v. United States, No. 179-59, Ct.Cl., February 14, 1964. Upon a review of the record in the case we are satisfied that the commissioner's finding is amply supported by the evidence. The local manager of the Associated General Contractors, acting upon information received from interested contractors, strongly urged defendant to increase the contract performance time from 540 to 800 days. Plaintiffs themselves, moreover, had requested defendant prior to bidding to fix the contract time at 730 days, based on their own estimates of performance requirements. Because of the size and technical nature of the project, the existence of certain unresolved discrepancies in the plans and drawings, and the pressing need of the Veterans Administration for the facility, a provision was inserted in the invitation for bids permitting individual contractors to submit bids based upon a performance time in excess of 540 days by adding to their bid a certain fixed sum per excess day. In fact, of the nine bids that were eventually submitted and opened at the appointed time, six were computed on the basis of a performance time of more than 540 days. Plaintiffs, however, elected to risk completing performance within the 540-day period, and submitted an offer of $7,898,000, which, being the lowest of those received, was accepted by defendant.[2]
 
 
 8
 In March of 1950, after the award had been made and the contract signed, plaintiffs commenced performance on the project, subcontracting approximately 80 percent of the work to some 57 different firms, seven of which have claims presented in this case. Plaintiffs were all experienced and qualified construction contractors, although they had never worked together before as a joint venture, nor individually, in the Salt Lake City area. The various subcontractors were also experienced and qualified in their respective fields, though most of them were California firms without previous experience of Salt Lake City.
 
 
 9
 During the course of performance, plaintiffs encountered difficulties of various sorts which seriously hindered and delayed their progress. Some of these problems were attributable to inadequacies and ambiguities in the plans and drawings, and others to factors beyond the control of either plaintiffs or defendant. As is conceded by defendant, the plans furnished to plaintiffs contained numerous errors, omissions and discrepancies. Although the majority of these defects were discovered through advance review and in the preparation of shop drawings, many of the errors were not uncovered until work on the pertinent phases of the project was actually in progress. Through close and continuous cooperation between plaintiffs' project manager and engineer and defendant's resident engineer and inspectors, most of the remaining specifications problems were solved on the site. Design and architectural problems were submitted to the architects who prepared the plans, and changes in basic criteria were referred to the District Engineer for decision.
 
 
 10
 Because most of the errors had to be corrected before the relevant work could begin or continue, defendant was compelled to order a large number of changes and alterations as performance progressed. Plaintiffs from the outset kept records of the extra costs they incurred in having to make the alterations and corrections ordered, and prepared a series of 470 estimates for submission to defendant, each of which was based on the direct costs of labor, materials, and equipment. Most of these estimates were approved by defendant as reflective of actual additional costs, and during the course of performance 35 change orders were issued granting plaintiffs a monetary adjustment in the contract price, including a percentage allowance for overhead and profit, of $298,563.27. Defendant from the start refused to entertain any estimate unless verified by records and based purely on the direct cost of labor and materials as applied to the particular types of work involved. Contested claims and all claims for extra costs allegedly resulting from confusion and delays in ordering and executing changes were deferred by agreement of the parties for presentation at the completion of the work.
 
 
 11
 In addition to those delays and expenses which resulted from changes in the plans and drawings, plaintiffs' performance was substantially affected by the Korean War, which commenced shortly after work had begun and continued through the duration of the project. The war caused a significant increase in the price of construction materials and equipment and in the wages of workmen. Having based their cost estimates and bid on pre-war prices and wage scales in stabilized market conditions, plaintiffs were seriously hurt by substantial increases in costs brought about by war-time conditions. Moreover, the Salt Lake City area had a relatively small and restricted labor market for skilled workers, and plaintiffs were confronted with severe shortages of brickmasons, due to competing war projects in general and to an emergency military construction project in the immediate vicinity in particular. Carpenters, plumbers, and other craftsmen were also in declining supply and, in order to alleviate these labor difficulties, plaintiffs were forced to advertise in newspapers throughout the country to attract skilled workers to the site. Because of the effect of the labor scarcity on their performance, plaintiffs specifically requested the contracting officer to extend the performance time 120 days. The relief desired was not granted, however, as the officer refused to recognize labor shortages as a valid justification for extensions under the contract.
 
 
 12
 Apparently believing that they would be entitled to reimbursement by the government for the additional costs being incurred due to wartime conditions, plaintiffs wrote several letters to defendant's District Engineer, detailing their plight and advising him of their intention to file formal claims to recover their extra expenses on the purchases of materials, tools, and equipment, and the costs of increased wages, overtime premiums, special bonuses, and advertising expenses incurred to maintain a sufficient labor force on the job. In conducting research on the proposed claims, however, plaintiffs came to the conclusion that the government would not be responsible for these additional expenditures under the provisions of the contract and, in fact, never formally filed the claims. Performance was also impeded because the plastering subcontractor refused to work in more than one building at a time, thereby delaying the scheduled performance of succeeding trades. The precise effect of this conflict among the subcontractors upon the overall progress of the work, however, has not been established by the evidence.
 
 
 13
 To mitigate the difficulties they were facing as a result of these various and sundry factors, plaintiffs filed several requests for extensions of time in the total amount of 1,075.75 days. The contracting officer denied most of the requests as unjustified, but did extend the completion date through the change orders to cover the full 318 days by which performance was in fact delayed. Of the 318 days thus allowed, 30 were specified as for labor strikes, and 8 for unusually severe weather. In addition, 45 days were allowed for the extra work of constructing a four-car garage, 53 days for the providing of additional laboratory facilities, 10 days for revision of roads, sidewalks, landscaping, and outside utilities, 2 days for changing footing elevations, and 153 days for miscellaneous changes.
 
 
 14
 Despite all the above-described impediments, some of which were due to errors and discrepancies in the plans and specifications or to the ordering of modifications and alterations in the work and some to extraneous factors beyond defendant's control, plaintiffs' performance under the contract proceeded with reasonable expedition.
 
 
 15
 After completion of the work, plaintiffs filed claims with the Corps of Engineers Claims and Appeals Board to cover those disputed items on which the contracting officer had earlier denied liability and refused payment, including claims for delay damages. The Board found that the number and scope of the errors in the plans and the consequent number and scope of changes ordered by defendant were quite reasonable and normal for a project of such size and complexity, and decided that "any delays caused by errors in [the] plans were concurrent with and comprehended within the greater delays occurring over the same period caused by the impact of the Korean War." Certain of plaintiffs' specific claims for additional direct costs, however, were sustained by the Board, and after its decision, a 36th change order was issued to encompass those items allowed. Plaintiffs were thus paid an additional $137,232.37, which brought their total compensation, including contract price and monetary adjustments, to $8,333,795.64. The commissioner has found that plaintiffs' total costs on the project, including all sums paid to the various subcontractors, amounted to $9,454, 301.13.
 
 
 16
 The first major claim presented is grounded in breach of contract. Plaintiffs maintain that they submitted their bid in complete reliance upon the accuracy and thoroughness of the specifications, fully believing that the project could profitably be completed within the 540 days specified. However, they allege that defendant knowingly furnished prospective bidders with critically defective plans and specifications, and thereafter compelled plaintiffs, to their financial detriment, to perform in strict accordance with the same. Plaintiffs claim that this action of providing fundamentally unworkable plans demonstrated a lack of good faith on the part of the government and constituted a material misrepresentation and breach of defendant's implied warranty that the plans were complete and adequate to the required task. Plaintiffs seek to recover as damages for this breach of warranty their entire loss on the project, measured by the difference between the total cost of performance (plus profit allowance) and the income received through payment of the contract price, as increased by the change orders. No attempt is made to distinguish between expenses arising out of deficiencies in the plans and expenses attributable to purely extraneous factors. Plaintiffs simply ask for a blanket recovery of all unrecouped costs on the contract, regardless of source.
 
 
 17
 Precedent indicates that the government implicitly warrants in a construction contract that if the contractor complies with the specifications furnished he will be able to complete the project within the contemplated period; and if the specifications are so faulty as to prevent or unreasonably delay completion of the contract performance, the contractor may recover his actual damages for breach of the implied warranty. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); Warren Bros. Roads Co. v. United States, 105 F.Supp. 826, 123 Ct.Cl. 48 (1952); Laburnum Construction Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963). But, in the case at bar, the evidence does not support plaintiffs' contention that the government-supplied documents were so substantially deficient or unworkable as to constitute a breach of the contract. Defendant engaged an experienced and qualified architectural firm to prepare the necessary designs and subsequently invited prospective bidders to offer their comments, with a view toward eliminating as many discrepancies as possible. Although the plans and specifications, as modified and refined, did in fact contain a large number of errors which eventually had to be corrected, it cannot be said that the cumulative effect or extent of these errors was either unreasonable or abnormal for a project of such encompassing scope and complexity. Plaintiffs have not carried their burden of proving that the commissioner's findings to this effect are unsupported by the evidence.
 
 
 18
 Moreover, plaintiffs necessarily had knowledge of the actual state of the plans and were cognizant of the fact that performance could only have been completed within 540 days under ideal conditions. Yet, they did not exercise the option offered to all prospective bidders of submitting their bids upon the basis of a longer performance time. They elected instead to enhance their competitive position by saving the required penalty sum and thereby willingly assumed the substantial risk of completing the project within the tight schedule of 540 days. Under the circumstances of the case, plaintiffs have not established by a preponderance of the evidence that defendant breached its implied warranty of reasonable accuracy or that plaintiffs were misled into assuming greater risks and responsibilities than they had anticipated. See Anthony M. Meyerstein, Inc. v. United States, 137 F.Supp. 427, 133 Ct.Cl. 694 (1956); Flippin Materials Co. v. United States, 312 F.2d 408, 160 Ct. Cl. 357 (1963); Archie & Allan Spiers, Inc. v. United States, 296 F.2d 757, 155 Ct.Cl. 614 (1961).
 
 
 19
 Assuming arguendo that a cause of action in breach of warranty could have been established, plaintiffs have failed, in any event, to prove their damages. They have offered evidence to show that the actual cost of completing the project greatly exceeded pre-bid estimates and resulted in a significant net loss on the contract. They have not, however, established the approximate extent to which any of this loss can be said to have been attributable to disruptions in operations caused by defects in the plans and specifications or to tardiness in ordering changes. The record is in fact replete with express admissions that the Korean War was a major factor in contributing to the delays in performance and the increases in the cost of labor and materials. The Claims and Appeals Board, in passing on plaintiffs' appeal in this case, denied most of the relief requested and noted that the relevant claims were originally conceived and filed as a hardship case resulting from the serious and continuing consequences of the Korean War. The trial commissioner, in deciding the facts after a trial de novo,[3] arrived at essentially the same conclusion — that the proliferating effects of the Korean hostilities contributed heavily to the difficulties encountered, and that plaintiffs had failed to carry their burden of proving that the delays or extra expenses were directly caused by the actions of defendant. See Archie & Allan Spiers, Inc. v. United States, supra. We have adopted this finding.
 
 
 20
 The "total cost plus profit" theory of computing damages advanced here by plaintiffs is appropriate only in "extreme cases," where no more satisfactory method is available. F. H. McGraw & Co. v. United States, 130 F. Supp. 394, 131 Ct.Cl. 501, 511 (1955). It assumes, inter alia, that defendant is in fact liable for all the injuries sustained, that plaintiffs' bid was accurately computed, and that the costs incurred were reasonable. F. H. McGraw & Co. v. United States, supra; River Construction Corp. v. United States, 159 Ct.Cl. 254 (1962); Laburnum Construction Corp. v. United States, supra. The case at hand is ill-suited to application of this method of computation. There is no reliable evidence in the record to serve as a basis for approximating the extent to which defendant, and not the Korean War or other factors beyond the control of defendant, was responsible for any of the loss sustained by plaintiffs on the contract. See Commerce International Co., Inc. v. United States, Ct.Cl., 338 F.2d 81; J. D. Hedin Construction Co., Inc. v. United States, Ct.Cl., 347 F.2d 235, 246-247 (1965).
 
 
 21
 Plaintiffs' second claim for relief, designated as under the theory of quantum meruit, is also essentially based on a breach of contract argument. It is alleged that defendant ordered such an unreasonable number of changes in the specifications that the contractor was compelled to construct a project substantially different in character from that contemplated at the time the contract was executed. Plaintiffs thus argue that the scope of the contract was fundamentally altered and seek to recover as damages for breach all reasonable costs incurred in constructing the facility for defendant.
 
 
 22
 Article 3 of the contract explicitly reserved to defendant the right to make changes in the specifications "within the general scope thereof," and provided for an equitable adjustment in the contract price to compensate plaintiffs for the cost of effecting such modifications. Defendant cannot be held liable for the exercise of this contractual privilege unless it exceeded the permissible limits of its discretion under the Changes article and ordered changes which were cardinal in nature. Aragona Construction Co., Inc. v. United States, No. 435-59, Ct.Cl., April 17, 1964; F. H. McGraw & Co. v. United States, supra; J. D. Hedin Construction Co., Inc. v. United States, supra, 347 F.2d at pp. 257-258; General Contracting & Const. Co. v. United States, 84 Ct.Cl. 570 (1937).
 
 
 23
 In the instant case defendant issued some 35 change orders covering various corrections in the specifications and alterations in the work, including changes in footing walls and columns, water table recomputations, furring of walls and ceilings and lowering of ceilings, finish and color changes, convector changes, door and door frame modifications, dimensional adjustments, and structural corrections. Although the changes ordered by defendant were extensive, we do not find that they were so extensive as to constitute a cardinal change.
 
 
 24
 There is no exact formula for determining the point at which a single change or a series of changes must be considered to be beyond the scope of the contract and necessarily in breach of it. Each case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole. Saddler v. United States, 287 F.2d 411, 152 Ct.Cl. 557, 561 (1961). The contractor cannot claim a breach of the contract if the project it ultimately constructed is essentially the same as the one it agreed in the contract to erect. Aragona Construction Co., Inc. v. United States, supra, p. 7.
 
 
 25
 The trial commissioner has found that the completed project was not substantially different from that contemplated in the original contract plans. The record supports the finding. Plaintiffs point to the fact that their total cost of performance, exclusive of profit allowance, exceeded the bid price by more than $1,500,000, or about 20 percent. This figure, however, does not truly reflect the effect of the changes ordered on the contract, since plaintiffs have failed to allocate between costs of performing extra work in accordance with the changes and costs unavoidably incurred as a result of alien factors. The total additional payments authorized by defendant under the Changes article as reasonable compensation for the verified costs of executing the alterations ordered in the work amounted to $435,795.64, or less than 6 percent of the contract price. Plaintiffs have not shown that this figure is incorrect or unreasonable. Instead, they stand on the basic unproved assertion that defendant was responsible for all losses on the contract.
 
 
 26
 Manifestly, plaintiffs' performance has been lengthier and costlier than anticipated at the time the bid was submitted, but in the long run they constructed essentially the same project as that described in the contract. This court's language in Aragona Construction Co., Inc. v. United States, supra, p. 8, in dealing with a somewhat similar situation, is particularly in point:
 
 
 27
 In this case, the changes did not materially alter the nature of the bargain into which plaintiffs had entered or cause it to perform a different contract. Plaintiff contracted to build a reinforced concrete hospital building on a certain site at Fort Howard, Maryland, and that is exactly what it built. The hospital, when it was completed, was in the same location, looked the same, had the same number of rooms and floors and the same facilities as the one shown on the original plans and specifications. Apart from the substitution of materials, it differed not at all from the building that had been contemplated when the contract was awarded.
 
 
 28
 Upon a review of the evidence as a whole, we conclude that such changes as were ordered by the contracting officer here were not cardinal in nature. Although extensive in number, they were entirely within the scope of defendant's discretion to make under the Changes article of the contract. Plaintiffs have been compensated by price adjustments for the verified costs of carrying out these alterations, and have not shown by a preponderance of the evidence that they are entitled to any additional sum.
 
 
 29
 In addition to the effect of the change orders, plaintiffs assert that defendant interfered with performance of the work by letting other construction projects in the immediate vicinity of the hospital, particularly an emergency military facility at nearby Hill Field. It is argued that in expeditiously pushing these ventures to completion defendant greatly reduced the supply of skilled workers in an already restricted labor market. This action is alleged to have impeded progress on the hospital project by diverting badly needed craftsmen and to have forced plaintiffs to expend substantial sums of money in order to maintain an adequate work force on the job.
 
 
 30
 Actions of a general and public character, implementing programs in the national interest, are considered to be acts of the sovereign for which defendant cannot be held liable in damages. Horowitz v. United States, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736 (1926); Jones v. United States, 1 Ct.Cl. 383 (1865); Wah Chang Corp. v. United States, 282 F.2d 728, 151 Ct.Cl. 41 (1950); Anthony P. Miller, Inc. v. United States, 161 Ct.Cl. 455, cert. denied, 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111 (1963). Even though a contractor may be directly or indirectly injured by the detrimental effect of other government projects on the relative labor market, he has no legal cause to complain if it is the sovereign that renders his performance more difficult to complete. See Bateson-Stolte, Inc. v. United States, 305 F.2d 386, 158 Ct.Cl. 455 (1962); Standard Accident Ins. Co. v. United States, 59 F.Supp. 407, 103 Ct. Cl. 607 (1945); Air Terminal Services, Inc. v. United States, Ct.Cl., 330 F.2d 974. The action of the United States in ordering the construction of other public facilities in the Salt Lake City area was an act of the sovereign, and plaintiffs here are precluded from any recovery upon the allegation that defendant violated an implied duty under the contract not to interfere with the performance or to make it more costly than necessary.
 
 
 31
 Plaintiffs' third major claim is for an equitable adjustment in the contract price under Article GC-11 of the contract — the Suspension of Work article.[4] This alternative theory of recovery rests upon the same basic factual contentions as do the breach of contract claims, except that here plaintiffs pray for relief within the framework of that document. Plaintiffs again maintain that the plans and specifications were fundamentally inadequate, that defendant ordered an unreasonable number of major changes, and that each change so ordered delayed performance and resulted in increased costs to the joint venture and its subcontractors. They contend that in light of the serious difficulties encountered because of defects and ambiguities in the plans, defendant should in all equity have suspended the work for its own convenience in order to work out a corrective set of plans. See T. C. Bateson Construction Co. v. United States, 319 F.2d 135, 160, 162 Ct.Cl. 145, 187 (1963); Ozark Dam Constructors v. United States, 288 F.2d 913, 153 Ct.Cl. 120 (1961). Failure to have done so is alleged to have caused unnecessary delay and uncertainty in plaintiffs' performance and to have resulted in substantial additional expense and hardship. It is the actual costs of this delay that plaintiffs now seek to recover through equitable adjustment.
 
 
 32
 To be compensable under the contract, however, delay must be for an unreasonable length of time. River Construction Corp. v. United States, supra, 159 Ct.Cl. p. 270; F. H. McGraw & Co. v. United States, supra, 130 F.Supp. 394, 131 Ct.Cl. pp. 506-507. Further, that delay must be shown to have been proximately caused by defendant's actions. River Construction Corp. v. United States, supra, 159 Ct.Cl. p. 270; Laburnum Construction Corp. v. United States, supra, 325 F.2d 451, 163 Ct.Cl. p. 349; J. A. Ross & Co. v. United States, 115 F.Supp. 187, 126 Ct.Cl. 323, 331-334 (1953). Plaintiffs' performance here required 318 days, or approximately 60 percent longer to complete than had been anticipated; but this figure is not of itself decisive, especially in a case where plaintiffs' bid was submitted on the basis of a very tight work schedule that could only have been fulfilled under ideal conditions and where much of the delay experienced resulted from a variety of largely unavoidable circumstances.
 
 
 33
 The plans furnished contained a substantial number of discrepancies, as any competent person who examined them at the time the bids were being prepared could readily have discerned. The fact that certain changes and corrections would have to be made was obvious. Apparent, too, was the implication that when such changes were effected certain delays in the prosecution of the work would likely result. Griffiths v. United States, 74 Ct.Cl. 245, 255 (1932); J. A. Ross & Co. v. United States, supra, 115 F.Supp. 187, 126 Ct.Cl. pp. 331-332; Laburnum Construction Corp. v. United States, supra, 325 F.2d 451, 163 Ct.Cl. p. 349; Anthony P. Miller, Inc. v. United States, 77 F.Supp. 209, 111 Ct.Cl. 252 (1948).
 
 
 34
 We have adopted the trial commissioner's finding that such errors as were periodically discovered during performance of the contract were acted upon by defendant with reasonable promptness. Through close and continuous cooperation with plaintiffs' personnel on the job, the government sought to minimize the effect of these errors by ordering necessary corrections and changes as soon as possible under the circumstances. All in all, the project required some 858 days to complete, instead of the 540 days bid upon, the 730 days originally expected by plaintiffs, or the 800 days requested by the Associated General Contractors as a reasonable performance period. The contract could only have been completed within the specified period under ideal conditions, but the conditions actually encountered were in fact far from ideal, for the Korean War significantly distorted the contractor's time and cost estimates. Considering the fact that a certain amount of delay was inevitable and expected in order to make necessary corrections in the plans, that defendant acted expeditiously to order these corrections, that the contractor assumed the significant risk of completing a unique, extensive, and complex project within an ideal performance period, and that the ramifications of the Korean War produced unforeseen disruptions in operations, it cannot be concluded that the delays actually experienced by plaintiffs on this contract were either unreasonable in duration under the circumstances or principally attributable to defendant's actions.
 
 
 35
 Plaintiffs have been granted extensions of time sufficient to cover the entire 318 days of actual delay without being assessed liquidated damages. They have also been compensated by defendant for the costs of such changes as they were ordered to make. In the absence of a showing that unreasonable delays were experienced in making necessary adjustments, plaintiffs are not entitled to an equitable adjustment under the Suspension of Work article of the contract.
 
 
 36
 A claimant need not prove his damages with absolute certainty or mathematical exactitude. Dale Construction Co. v. United States, No. 134-57, Ct.Cl., December 11, 1964; Houston Ready-Cut House Co. v. United States, 96 F.Supp. 629, 119 Ct.Cl. 120 (1951). It is sufficient if he furnishes the court with a reasonable basis for computation, even though the result is only approximate. F. H. McGraw & Co. v. United States, supra; Locke v. United States, 283 F.2d 521, 151 Ct.Cl. 262 (1960). Yet this leniency as to the actual mechanics of computation does not relieve the contractor of his essential burden of establishing the fundamental facts of liability, causation, and resultant injury. River Construction Corp. v. United States, supra; Addison Miller, Inc. v. United States, 70 F.Supp. 893, 108 Ct.Cl. 513 (1947), cert. denied, 332 U.S. 836, 68 S.Ct. 217, 92 L.Ed. 408 (1947); J. D. Hedin Construction Co., Inc. v. United States, supra, 347 F.2d at pp. 246-247. It was plaintiffs' obligation in the case at bar to prove with reasonable certainty the extent of unreasonable delay which resulted from defendant's actions and to provide a basis for making a reasonably correct approximation of the damages which arose therefrom. Aragona Construction Co., Inc. v. United States, supra; Laburnum Construction Corp. v. United States, supra. Broad generalities and inferences to the effect that defendant must have caused some delay and damage because the contract took 318 days longer to complete than anticipated are not sufficient. Commerce International Co., Inc. v. United States, supra.
 
 
 37
 Although we do not doubt that plaintiffs and their subcontractors encountered delays and difficulties in proceeding with the plans provided by defendant, all that plaintiffs have attempted to prove with respect to any of the major claims is the total amount of costs and the total delay experienced on the project. No satisfactory evidence has been presented to differentiate between reasonable and unreasonable government delays, or between delays attributable to defendant and delays unavoidably caused by extraneous circumstances. It is incumbent upon plaintiffs to show the nature and extent of the various delays for which damages are claimed and to connect them to some act of commission or omission on defendant's part. See Laburnum Construction Corp. v. United States, supra. This is especially true where there has been an affirmative showing that other causes, for which defendant was not responsible, contributed materially to the delays in construction. Commerce International Co., Inc. v. United States, supra. The trial commissioner has found that "the evidence does not establish the extent, if any, to which there were delays in the performance of the contract * * * [or] * * * the extent, if any, to which the costs of plaintiffs and each of the * * * subcontractors were increased as a result of the revisions and corrections of the contract plans, specifications, and drawings, necessitated by errors, omissions, and discrepancies therein, nor does the evidence establish any basis for a reasonable approximation of such increased costs." We have adopted these findings and are compelled to conclude that there has been a critical lack of proof of causation.
 
 
 38
 As plaintiffs have pointed out in their brief, the claims of their subcontractors, which are designated as Claim 1, are grounded upon the same rules of law and arguments as plaintiffs' Claim 1. Since there are no significant factual differences in any subcontractor's claim which would entitle it to recover on grounds other than those asserted in behalf of plaintiffs' main claim, the subcontractors' claims in this category fall for the same reasons as plaintiffs' Claim 1.
 
 
 39
 Since we have concluded that plaintiffs are not entitled to recover for themselves or in behalf of their subcontractors on Claim 1, we shall now consider the remaining six claims. Two of these are separate from Claim 1, whereas the remainder are in the alternative to Claim 1 and involve claims for extra costs that were included within the items covered by Claim 1 (finding 75).
 
 
 40
 CLAIM OF LAUREN BURT, INC.
 
 
 41
 Lauren Burt, Inc., plaintiffs' subcontractor for the installation of asphalt tile flooring in most of the rooms and corridors of the project, was paid by change orders for all the direct costs it incurred on account of finish, color, and dimensional alterations. In this claim, recovery is sought, as a separate and distinct item, for the costs of reviewing certain documents in connection with the performance of its subcontract. From time to time, as the contracting officer ordered changes in the plans and specifications, plaintiffs issued a series of change-of-plan authorizations to the various subcontractors setting forth the items of work to be altered. Lauren Burt maintains that it was required to review, study, and analyze each of these authorizations in order to determine whether any of its own work would be involved and to ascertain the extent to which any of its plans would have to be modified accordingly. The subcontractor claims entitlement to the sum of $250 as the reasonable cost of such reviews, based upon a figure of $1 per page of authorization and $2 per item of change.
 
 
 42
 The tile flooring subcontractor also made studies at the request of defendant's resident engineer of 479 additional items of color and finish changes and claims the sum of $958 for such reviews and reports. In addition, the subcontractor's claim includes an item of $100 for the alleged submission of an estimate to plaintiffs for the repair of storage and temporary office space.
 
 
 43
 No record was kept of any of the costs claimed by Lauren Burt. All of the work was performed by its president who testified that the amounts sought to be recovered are reasonable charges for the work.
 
 
 44
 Lauren Burt, Inc., was paid for its extra direct costs on account of finish, color and dimensional changes through approved change orders. None of the items included within the present claim was ever presented to the defendant's contracting officer or to the Corps of Engineers Claims and Appeals Board. Since plaintiffs failed to exhaust their administrative remedy on this claim, recovery is precluded. United States v. Joseph A. Holpuch Co., 328 U.S. 234, 66 S.Ct. 1000, 90 L.Ed. 1192 (1946).
 
 CLAIM 18-A OF WASATCH CACHE ELECTRIC COMPANY
 
 45
 The separate claim of Wasatch Cache Electric Company, plaintiffs' subcontractor for installation of the electrical system and fixtures throughout the project, involves the direct additional costs of installing supports in recessed electrical fixtures. The drawings and specifications did not specifically indicate the type of support necessary to sustain recessed fixtures installed in project ceilings having metal pan acoustical tile, as they merely provided that such outlets were to be installed "in a rigid and satisfactory manner". The National Electrical Code, however, which was incorporated by reference into the specifications, listed a number of ways in which such fittings should be secured. Wasatch requested defendant's District Engineer to provide specific designs for such supports but that officer declined to furnish the plans, stating that plaintiffs had the obligation of doing whatever was necessary to accomplish a complete and satisfactory job. Thereupon, the subcontractor provided supports for the fixtures in a reasonable and economical manner consonant with the Code. The method used was approved by defendant's resident engineer.
 
 
 46
 The Corps of Engineers Claims and Appeals Board decided that the specifications were sufficiently complete and that defendant had no duty to provide a design for the supports, as the National Electrical Code provided the contractor with a choice of reasonable and economical methods to achieve the desired objective. Plaintiffs assail the findings of the Board as erroneous and gratuitous on the grounds that they essentially involved a question of law. The commissioner determined that the Board's findings were reasonable and were supported by substantial evidence. From a reading of the contract and specifications and a review of the relevant evidence, we conclude that defendant's interpretation of the contract was correct and that no duty of design was imposed upon defendant. Therefore, plaintiffs are not entitled to recover on this claim.
 
 CLAIM 3-AD OF RISK-SUTTON COMPANY
 
 47
 Claim 3-AD of Risk-Sutton Company, plaintiffs' painting subcontractor, involves the allowability of certain costs allegedly incurred as a result of the substitution of two types of surfacing materials used on the project. One of these changes concerned the substitution of primer sealer for erroneously specified paint, and the other the substitution of a washable enamel paint for the water-base paint originally specified for interior surfaces of the boilerhouse. Disputes arose on both items as to the amount of extra costs incurred as a result of making the changes, and to establish support for its contentions, Risk-Sutton engaged the services of two research laboratories, at a cost of $625, to determine the relative costs of application. On two or three occasions, however, defendant's representatives rejected the subcontractor's estimates of extra costs. Instead, the government had time and material studies made at its own expense in Pittsburgh, and the results of these tests were used as the basis for the ultimate settlement of the extra costs due to the primer sealer change. We have found that neither of the Risk-Sutton laboratory reports contributed to the resolution of the dispute. The subcontractor is not entitled to recover the costs of the laboratory tests made for the purpose of preparing and presenting its claims to defendant's representatives.
 
 
 48
 Risk-Sutton also seeks to recover the travel expenses of one of its partners for several round trips from the firm's headquarters in Los Angeles to the job site in Salt Lake City, and two round trips to San Francisco in connection with the above-mentioned laboratory tests, at a total cost of $1,160.45. Although the trips are alleged to have been made as a direct result of the disputes over the primer sealer and boilerhouse paint and because of other paint substitution problems, the evidence does not support the contention. The trips were not made solely in connection with the relevant disputes over changes in paint types. The record shows that they were made as part of the partner's frequent and prolonged attendance on the job site in his regular supervision of the subcontract performance. Plaintiffs have not shown entitlement to any recovery on this claim in behalf of the subcontractor.
 
 CLAIM 15-D OF RISK-SUTTON COMPANY
 
 49
 This claim was presented in behalf of Risk-Sutton Company, the painting subcontractor, to recover extra costs alleged to have been incurred in repainting spaces due to the repair of plaster cracks in numerous rooms on the project. The issue involved is whether the plaster cracks occurred as a result of a defect in defendant's design. After hearing the expert testimony adduced by both parties on the question, the trial commissioner found that the spalling and cracking of plaster was not caused by faulty design features of the project buildings. He also found that there was no substantial evidence to show the extent to which the painting subcontractor incurred extra costs in repainting surfaces where the allegedly faulty design cracks were repaired. After reviewing the record, we are satisfied that these findings are supported by the evidence and have adopted them. Consequently, the claim is disallowed.
 
 CLAIM 15-A OF PLAINTIFFS
 
 50
 This claim is for the reasonable costs expended by plaintiffs in providing temporary heat during the period from November 1951 through the following winter months.
 
 
 51
 The specifications required the contractor to provide at his own expense temporary heat to prevent injury to work or material through dampness or cold. In July 1951, plaintiffs' project manager requested permission to use the main boiler plant and permanent heating facilities in all the buildings to supply temporary heat when needed during the following fall and winter months. The contracting officer granted plaintiffs' request on the basis of their agreement to assume all expenses connected with such temporary heat.
 
 
 52
 We have found that plaintiffs did not incur the claimed expense as a result of unreasonable delays on the part of defendant and that plaintiffs agreed to pay for all costs in connection with the temporary heat used. Therefore, plaintiffs are not entitled to recover on this claim.
 
 
 53
 ITEMS 5 AND 8 OF CLAIM 6-AB, HICKMAN BROS., INC.
 
 
 54
 These two claims are parts of Claim 6-AB, which was presented to the Corps of Engineers Claims and Appeals Board.
 
 
 55
 The specifications provided for the installation of clay tile partitions in certain areas but authorized the contractor to use cinder block in lieu of tile. Plaintiffs elected to use cinder blocks in such areas. The specifications also provided that the plumbing fixtures were to be secured and fastened to the structural walls by brass toggle or through bolts. When Hickman Bros., Inc., the plumbing and heating subcontractor, began running pipes to fixtures in areas where cinder blocks had been installed, the mortar between the blocks would not hold the bolts for hanging the plumbing fixtures. To meet this problem, plaintiffs installed a steel plate across the mortared areas and attached the plumbing fixtures to the plate. The trial commissioner found that the Corps of Engineers Claims and Appeals Board had denied the claim on the basis of a determination, supported by substantial evidence, that the extra costs were the direct consequence of the exercise by plaintiffs of their option to use cinder block instead of tile for the partition walls.
 
 
 56
 Item 8 of Claim 6-AB is a claim by the heating and plumbing subcontractor for extra labor and materials used in rerouting and relocating interior utility lines. The Corps of Engineers Claims and Appeals Board found that considerations of economy led Hickman Bros., Inc., to request approval of the rearrangement and relocation of the utility lines and that the subcontractors saved money thereby. Our trial commissioner has found that the Board's determination of this matter is supported by substantial evidence.
 
 
 57
 Plaintiffs have not excepted to the commissioner's findings regarding these claims and have not mentioned them in their brief. We have therefore adopted the commissioner's findings, and it follows that the plaintiffs are not entitled to recover on these claims.
 
 DEFENDANT'S COUNTERCLAIM
 
 58
 At a pretrial conference the parties stipulated that defendant's counterclaim was abandoned and no proof in support thereof was presented. Accordingly, defendant's counterclaim is dismissed.
 
 
 
 Notes:
 
 
 [1]
 The correct spelling of this plaintiff's name, as shown by its own letterhead and communications, is Chas. H. Tompkins, although for some unexplained reason, the petition was filled in the name of Chas. H. "Thompkins"
 
 
 [2]
 The second lowest bidder, Utah Construction Company, offered to construct the project for a price of $7,962,000, based on a performance time of 760 days. If this contractor had bid on the basis of 540 days, as plaintiffs did, and had it therefore saved the excess sum which it was required to add to its bid for the extra 220 days, it, and not plaintiffs, would have been the lowest bidder. In addition, if plaintiffs themselves had bid on the basis of the 730 days which they had proposed to defendant prior to bidding and had they thereby incurred the required penalty for the 190 days in excess of the contract time, again Utah would have been low bidder
 
 
 [3]
 Since there was no timely objection to the de novo evidence presented by both parties, such evidence has been considered in this case. Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 162 Ct.Cl. 802 (1963)
 
 
 [4]
 GC-11, the Suspension of Work clause commonly used by the Corps of Engineers at the time reads in part as follows:
 "The Contracting Officer may order the Contractor to suspend all or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government. Unless such suspension unreasonably delays the progress of the work and causes additional expense or loss to the Contractor, no increase in contract price will be allowed. In the case of suspension of all or any part of the work for an unreasonable length of time causing additional expense or loss, not due to the fault of negligence of the Contractor, the Contracting Officer shall make an equitable adjustment in the contract price and modify the contract accordingly."