**COASTAL INDUSTRIES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 92–185C.

United States Court of Federal Claims.

Dec. 2, 1994.

See also, 27 Fed.Cl. 713.

Fred A. Cohen, McLean, VA, and Alan M. Grayson, of counsel, for plaintiff.

Donna C. Maizel, Civil Division, United States Department of Justice, Washington, D.C., with whom were Frank W. Hunger, Asst. Attorney General, David M. Cohen, Director, Anthony H. Anikeeff, Assistant Director, and Maria Santucci, Defense Personnel Support Center, Defense Logistics Agency, of counsel, for defendant.

## OPINION

MARGOLIS, Judge.

This contract case is before the court after a two-part trial on the merits held in Montgomery, Alabama and Washington, D.C. Plaintiff, Coastal Industries, Inc. ("Coastal"), contracted with defendant, the United States, acting through the Defense Personnel Support Center ("DPSC"), Defense Logistics Agency, to manufacture flame-retardant denim pants. Plaintiff argues it is entitled to an equitable adjustment as a result of defendant's defective cloth specifications, delay in testing, and incorrect testing procedures over the course of five contracts. Defendant argues that plaintiff failed to prove entitlement and asserts the affirmative defenses of accord and satisfaction, final payment, and waiver and release. After a seven-day trial and a careful review of the record, the court finds that plaintiff failed to prove entitlement on the merits and that final payment and waiver and release bar recovery in this case.

## FACTS

Plaintiff is an apparel manufacturer located in Selma, Alabama and has sewn trousers for the government for 25 years. Coastal contracted with defendant to produce flame-retardant denim pants for use by U.S. Navy men and women personnel under the following contracts:

| Contract Number | Contract Date |
|---|---|
| DLA100–86–C–0870 ("0870") | Sept. 24, 1986 |
| DLA100–86–C–0890 ("0890") | Sept. 26, 1986 |
| DLA100–86–C–0891 ("0891") | Sept. 26, 1986 |
| DLA100–86–C–0418 ("0418") | March 7, 1988 |
| DLA100–86–C–0419 ("0419") | March 7, 1988 |

The contracts incorporated, either expressly or by reference, the standard Federal Acquisition Regulations ("FAR") clauses concerning changes, delays and disputes. The contracts also required cloth suppliers to certify that cloth lots complied with MIL–C–24915 and permitted government verification testing.

MIL–C–24915 was the government performance specification for flame-retardant cloth and was developed in consultation with the cloth manufacturing industry. Industry groups and manufacturers, including one of Coastal's cloth suppliers, Westex, Inc. ("Westex"), specifically responded during development of MIL–C–24915 that commercial suppliers could meet the specification's requirements. Prior to promulgation of MIL–C–24915, the government tested flame-retardant denim cloth supplied by Westex to measure the performance capabilities of the cloth and attained results which satisfied the performance specification.

Flame resistance, uniformity of shade, colorfastness to light, and dimensional stability[1] are important characteristics of the fabric. The cloth must meet or exceed the specification's requirement for flame resistance, both before and after laundering, and for dimensional stability after laundering. The cloth must also match a specified standard sample for shade and be equal to or better than the standard when tested for colorfastness to light and laundering. *See* MIL–C–24915, Joint Exhibit 9.

Prior to beginning production on the contracts in this case, plaintiff successfully performed three contracts to manufacture flame-retardant denim pants. Riegle Textiles ("Riegle") provided flame-retardant denim cloth for two of the prior contracts. In this case, Riegle supplied cloth for contracts 0870, 0890, and 0891; and Westex provided cloth for contracts 0418 and 0419.

From the outset of contract performance, Coastal did not receive sufficient cloth from Riegle to meet its delivery schedule and plaintiff sought a 60–day extension for the

0870 contract in December 1986. Plaintiff first received notice that a cloth lot had failed DPSC verification testing for dimensional stability on January 30, 1987. DPSC retested two cloth lots at Coastal's request but they again experienced dimensional stability failures. Following these retests, plaintiff requested a waiver to allow shipment of the trousers which did not comply with MIL–C–24915. Riegel took corrective action to improve the dimensional stability characteristics of its cloth. However, Riegle did not deliver cloth to plaintiff in February or March 1987, and delivered only small quantities once it resumed shipment.

By August 1987, Riegle failed to deliver sufficient cloth to permit Coastal to meet its delivery schedule for the 0890 contract. Furthermore, Riegle cloth lots 11, 13, 14 and 16–20 failed colorfastness to light testing. Riegle cloth had also experienced testing failures for shade, colorfastness to laundering, wet crocking,[2] weight and flame-resistance. With respect to colorfastness, MIL–C–24915 prohibits the use of flame-retardant denim cloth which contains more labile (chemically reactive) sulfur than the standard sample when tested in accordance with test method 2020. Riegle cloth was originally dyed in the warp direction (lengthwise direction of the pants) with indigo dye and in the filling direction (horizontal direction of the pants) with direct dyes. Coastal requested a waiver for cloth lot 20 on September 10, 1987. Coastal also negotiated revised delivery schedules for contracts 0890 and 0891, acknowledged its inexcusable delay and offered consideration totaling $3000 for the delivery schedule extensions in January 1988.

In late 1987, plaintiff contacted Riegle seeking reimbursement for costs incurred by Coastal as a result of cloth testing failures. In May 1988, Coastal sent Riegle cloth lots to an independent lab for testing and obtained failures for wet crocking, breaking strength and afterflame. Riegle had issued passing test results for the cloth. Coastal obtained a $185,000 credit memorandum from Riegle as a settlement of the dispute. Coastal ob-

---

1. Dimensional stability refers to the ability of a fabric to retain its size and shape, instead of shrinking or spreading.

2. Wet crocking involves rubbing a fabric and measuring the amount of dye removed.

tained additional credit memoranda for the cost of contract modifications for waivers issued as a result of failing Riegle cloth. Final payment for contract 0870 was made by the government to Coastal in May 1988. Final payment for contract 0891 was made in September 1988.

In June 1988, a DPSC chemist visited the laboratory of Coastal's new cloth supplier, Westex, to observe tests on cloth that had failed DPSC testing. DPSC discovered that the Westex laboratory modified prescribed testing methods and could not control the relative humidity or temperature of areas required to be maintained at standard conditions. As a result, defendant removed the Westex laboratory from the Qualified Laboratory List. After DPSC issued other failing test results on Westex cloth, a second independent laboratory obtained similar failures.

In response to the cloth suppliers' inability to meet the requirements of MIL–C–24915 consistently, defendant relaxed the dimensional stability standard from 2% to 3%, increased the maximum afterglow period from two seconds to five seconds, and reduced the maximum exposure time for colorfastness testing from 140 to 40 hours. Defendant incorporated the modifications into the unfinished 0890, 0418 and 0419 contracts in December 1988.

In early 1989, DPSC testing revealed flame-resistance failures for Westex cloth lots 11, 13–15 and 18–21.[3] The contracting officer ("CO") did not issue waivers for these failures because flame-resistance was the critical characteristic of the contract item. On April 19, 1989, the parties met and agreed to accept lots 14–17 as non-flame retardant trousers. A bilateral contract modification encompassing the agreement unconditionally released and waived Coastal's claims for the 0419 contract. A month after executing the non-flame retardant modification, Coastal requested and the defendant executed a second modification with the same terms and conditions for cloth lots 18–21.

Coastal submitted properly certified claims totaling $1,024,437 to the CO on January 13, 1989, and submitted additional claim information by letter dated June 11, 1990. On March 20, 1991, the CO denied Coastal's claims because they lacked technical merit and because plaintiff executed an unconditional waiver and release of claims on the 0419 contract. In preparation for this litigation, the Defense Contract Audit Agency ("DCAA") audited Coastal's claims. DCAA found that Coastal generally had not substantiated its claims with sufficient documentation and noted many irregularities in plaintiff's claim methodology.

## DISCUSSION

A contractor seeking an equitable adjustment to the contract price has the burden of establishing the fundamental facts of liability, causation and resultant injury. *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 199, 351 F.2d 956 (1965). In order to recover on a delay claim, a contractor must show that: (1) the length of the delay was unreasonable; (2) the delay was proximately caused by government action; and (3) the delay resulted in injury to the contractor. *Id.* at 198–99, 351 F.2d 956. Further, the contractor must show that the government was the sole proximate cause of the delay, and no concurrent cause would have equally delayed the contractor. *Merritt–Chapman & Scott Corp. v. United States*, 208 Ct.Cl. 639, 649–50, 528 F.2d 1392 (1976).

### Liability

Coastal asserts entitlement to equitable adjustments on the five contracts as a result of defendant's defective cloth specification, erroneous information provided by the government interpreting the specification, delay in testing, and incorrect testing procedures.

---

**3.** DPSC, the Navy Clothing and Textile Research Facility, and the U.S. Army Natick Research, Development and Engineering Center laboratories participated in an interlaboratory evaluation to determine whether the type of detergent or sour used in the prescribed laundering method contributed to the flame-resistance failures experienced by Westex cloth lots. While achieving somewhat varied results, each of the laboratories found multiple failures in lots 19 and 20, and sparse failures in lots 22, 23 and 25. The government concluded that the flame-resistance failures were not related to the type of detergent or sour used in the test method.

The court addresses and rejects plaintiff's claims *seriatim.*

■ Plaintiff argues that MIL–C–24915 was defective as promulgated because it was impracticable for cloth suppliers to meet its 2% dimensional stability standard. In order to recover costs incurred attempting to satisfy a defective specification, plaintiff must establish that the specification embodies requirements objectively impossible or commercially impracticable to attain. *See Intercontinental Mfg. Co. v. United States,* 4 Cl. Ct. 591, 595 (1984).

■ Coastal purchased cloth from Riegle and successfully completed two flame retardant trouser contracts before experiencing difficulty on the contracts in this case. The difficulty attaining the 2% dimensional stability requirement during performance of the 0870 contract was likely a result of poor cloth processing at the Riegle manufacturing facility. The relaxation of that requirement to 3% was done for the benefit of Coastal and its suppliers, and is not construed by this court as an implied admission by defendant that the requirement was commercially unattainable. Further, Westex and other cloth suppliers participated in the development of MIL–C–24915 and stated that its requirements could be satisfied by commercial suppliers. Thereby, on the facts of this case, the cloth suppliers assumed the risk of impossibility. *See Bethlehem Corp. v. United States,* 199 Ct.Cl. 247, 252, 462 F.2d 1400 (1972). Moreover, the cloth manufacturers demonstrated that they were capable of producing compliant cloth because many cloth lots passed DPSC testing, especially after implementation of corrective measures in response to specific recurring failures. The court concludes that MIL–C–24915 was not defective as promulgated.

■ Coastal argues that the colorfastness failures experienced by Riegle cloth were the result of erroneous government information regarding the permissibility of sulfur dye in flame-retardant denim cloth. According to plaintiff, defendant informed Riegle that the standard did not contain sulfur. However, plaintiff did not introduce any reliable evidence at trial establishing that a government agent with authority to interpret or modify the contract requirements ever conveyed such information to Riegle. MIL–C–24915 plainly states that compliant cloth shall contain no more labile sulfur than that contained in the standard sample as measured by test method 2020. The court finds that this language is unambiguous.[4] Utilization of test method 2020 as directed by the specification would have revealed the presence of sulfur in the standard and, thus, that sulfur dyes were permitted in the contract items. Furthermore, defendant presented persuasive evidence that the colorfastness requirements of MIL–C–24915 could have been met without the use of sulfur dyes. The court concludes that plaintiff has not established government liability by a preponderance of evidence for colorfastness failures based on the absence of sulfur dye in Riegle cloth.

■ Coastal also alleges that it suffered delay as a result of DPSC's delay in issuing the initial failing test report. However, government verification testing was not subject to a contractually-imposed time limit because plaintiff was in a reliable status when it submitted the first cloth lot for testing. Because the court can find no other instances of significant testing delay in the record, the court concludes that Coastal cannot recover damages on the theory of testing delay.

■ Plaintiff also argues that DPSC misinterpreted a washing method utilized to test compliance with MIL–C–24915, and washed test material in 20–pound loads rather than five pound loads as required by test method 5556. Test method 5556 first specifies use of a 20–pound load size and then identifies the size of the sample to be tested. The court

---

4. Plaintiff introduced into evidence an internal government memorandum which concludes that MIL–C–24915 is ambiguous as to the permissibility of sulfur dye in the contract items. This court cannot agree. The specification prohibits the use of dyes containing elementary sulfur capable of oxidation to sulfuric acid. The specification further states that compliant cloth shall contain no more labile sulfur than the standard sample when tested or, if the standard is not available, no more than a slight trace of labile sulfur. The clear language of MIL–C–24915 puts the contractor on notice that it should test the sample for sulfur content.

finds that DPSC properly utilized a 20–pound load size comprised of test material and ballast. Moreover, on the facts before it, the court cannot conclude that load size or detergent deposits caused the flame-resistance failures experienced by Westex cloth on the 0419 contract or Riegle cloth on previous contracts. This finding is underscored by the initial flame-resistance failures experienced by Westex cloth lot 19 prior to washing. The court concludes that plaintiff has not established government liability for flame-resistance failures.

■ Plaintiff further alleges that the DPSC laboratory committed other widespread testing errors over the course of the five contracts. However, Coastal identifies only one specific instance of testing error—a colorfastness test during which cloth was allegedly erroneously overexposed to light for 140 hours. Plaintiff alleges that other testing irregularities occurred such as improper positioning of samples during afterflame and afterglow testing, difficulty in measuring afterflame and afterglow, improper reporting of afterglow failures, and testing at nonstandard conditions. After reviewing the record relating to DPSC testing, the court finds that Coastal has not established by a preponderance of the evidence either that testing irregularities occurred or that DPSC testing errors resulted in the rejection of otherwise compliant cloth. The fact that testing performed by DPSC, two independent laboratories, and two other government laboratories during the interlaboratory evaluation yielded substantially the same results— lots failed by DPSC were also failed by the other laboratories—reinforces this finding. Any differential in laboratory test results can be attributed to variability in fabric processing.

■ Assuming *arguendo* that defendant delayed plaintiff's performance, plaintiff has not established the essential element of causation with respect to the 0870, 0890, and 0891 contracts. *See Wunderlich Contracting Co.*, 173 Ct.Cl. at 198–99, 351 F.2d 956. In order to prevail on the issue of causation, the contractor must show that the government was the sole proximate cause of the delay, and no concurrent cause would have equally delayed the contractor. *Merritt–Chapman & Scott Corp.*, 208 Ct.Cl. at 649–50, 528 F.2d 1392. Coastal did not receive sufficient cloth from Riegle to meet its delivery schedule for the 0870 contract. This cloth shortage existed before receiving the first failing DPSC test report on Riegle cloth. By August 1987, Riegle had not delivered sufficient cloth to permit Coastal to meet its delivery schedule for the 0890 contract. These later shortages were due, in part, to the decision by Riegle to ship small amounts of cloth in each lot until it could produce cloth which consistently passed verification testing. Furthermore, in March 1987, defendant suspended Coastal from government contracting because it paid a competitor to withdraw a bid on a trouser procurement. Plaintiff subsequently plead guilty to a felony violation of the Sherman Antitrust Act. The suspension from government contracting and the subsequent criminal action caused turmoil at the Coastal plant. The court finds that these concurrent causes could have equally delayed Coastal's performance of the contracts.

*Affirmative Defenses*

1. Final Payment

■ The government asserts numerous affirmative defenses to Coastal's contract claims including the doctrines of final payment, accord and satisfaction, and waiver and release. Defendant argues that plaintiff's claims relating to the 0870 and 0891 contracts are barred because Coastal did not file its claim prior to final payment as required by the delay and changes clauses of the contracts. A contractor is generally precluded from asserting a claim after final payment if the contract so provides. *E.g., Jo–Bar Mfg. Corp. v. United States*, 210 Ct.Cl. 149, 156–57, 535 F.2d 62 (1976). Plaintiff cites *H.H.O. Co. v. United States*, 12 Cl.Ct. 147 (1987), for the proposition that such notice provisions should be construed liberally. *H.H.O.* does not, however, compel the result desired by the plaintiff. Here, the defendant does not argue that Coastal failed to provide written notice of claims within a specified period of the events giving rise to the claims. Instead, defendant argues that the claims are time-barred because they were not filed be-

fore final payment as required by the contracts. *See* FAR §§ 52.212–15(b). Final payment acts as a bar except

> [w]here the contracting officer knows, or is properly chargeable with knowledge, that at the time of final payment the contractor is asserting a right to additional compensation, even though formal claim therefor has not been filed, the fact of final payment does not bar consideration of a later formal claim. Nor are any special words or formal means of communications required in presenting a claim for additional compensation.

*Jo–Bar Mfg. Corp.*, 210 Ct.Cl. at 157, 535 F.2d 62.

 Plaintiff alleges that it repeatedly informed the government that Coastal would hold the defendant responsible for testing errors. Coastal asserts that its contract administrator had numerous contacts with the CO over the course of the five contracts. While part of that correspondence references delays experienced as a result of testing failures, it is silent as to any intent to hold the government liable. Coastal's president presented equivocal testimony that she orally informed various COs that plaintiff intended to hold the government responsible for damages incurred by Coastal. Finally, Coastal's president testified that in July 1988, she informed an employee of Defense Contract Operations of Coastal's intent to file a claim. Coastal's contract administrator, who was also present during the conversation, corroborated the testimony.

 Final payment for contract 0870 was made by the government to Coastal in May 1988 and final payment for contract 0891 was made in September 1988. Nothing in the record suggests that Coastal informed defendant that it intended to hold the government liable for damages sustained as a result of failing Riegle cloth. To the contrary, Coastal actively pursued compensation for damages from its cloth supplier. The court finds that plaintiff did not take any action prior to the July 1988 conversation such that CO knew, or was properly chargeable with knowledge, that Coastal was asserting a right to additional compensation. However, the court further finds that as a

result of the July 1988 conversation, the CO was properly chargeable with such knowledge. Therefore, the court concludes that final payment bars plaintiff's claim based on the 0870 contract but does not bar the 0891 contract claim.

### 2. Accord and satisfaction

 Defendant asserts the defense of accord and satisfaction as to Coastal's delay claims on contracts 0890 and 0891 because plaintiff entered into modifications extending the delivery schedules. The government also raises this defense as to plaintiff's defective specification claims on contracts 0890, 0418, and 0419 as a result of bilateral contract modifications altering testing procedures. An accord is reached if one party agrees to supply something other than that which was originally due, and the other party agrees to accept it in settlement of an existing claim. *See McLain Plumbing & Electrical Service, Inc. v. United States*, 30 Fed.Cl. 70, 79 (1993). Satisfaction is the actual performance of the accord. *Chesapeake & Potomac Tel. Co. v. United States*, 228 Ct.Cl. 101, 108, 654 F.2d 711 (1981).

 Under the case law, the

> [d]ischarge of a claim by accord and satisfaction occurs when some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim.

*Community Heating & Plumbing Co., Inc. v. Kelso*, 987 F.2d 1575, 1581 (Fed.Cir.1993). Accord and satisfaction serves to discharge a claim when alternative performance is accepted. The party asserting the defense has the burden of proving that the requirements of an accord and satisfaction are satisfied. *McLain Plumbing*, 30 Fed.Cl. at 80. Significant here is the requirement that the parties must have agreed to enter an accord. *Chesapeake & Potomac*, 228 Ct.Cl. at 108–09, 654 F.2d 711.

 The court finds, regarding contracts 0890, 0891, 0418 and 0419, that there was no "meeting of the minds," without which there can be no accord and satisfaction. *Westerhold v. United States*, 28 Fed.Cl. 172, 174–75

(1993). The record contains no indication that parties were aware of any claim arising in favor of plaintiff or that the modifications were executed in settlement of a claim. Moreover, the government's conduct after the modifications suggests that the requisite intent did not exist when the modifications were executed. *Community Heating & Plumbing,* 987 F.2d at 1581.

### 3. Waiver and release

The government raises the defense of waiver and release with respect to Coastal's claims on contract 0419. Westex cloth lots 14–17 failed flame-resistance testing. On April 19, 1989, the parties met and agreed to accept lots 14–17 as non-flame retardant trousers with a corresponding reduction in contract price. The bilateral contract modification unconditionally released and waived Coastal's claims on the 0419 contract. A month after executing the non-flame retardant modification, Coastal requested and the defendant executed a second modification upon the same terms and conditions for cloth lots 18–21.

■ Plaintiff argues that the waiver and release language of the modifications should not be given effect as a result of economic duress. *See, e.g., Progressive Brothers Constr. Co. v. United States,* 16 Cl.Ct. 549, 553 (1989) ("[a] claim can be prosecuted following the execution of a release, if the release was signed under duress").

> An analysis of economic duress involves three factors: (1) whether one side accepted the terms of another involuntarily, (2) whether the circumstance permitted no alternative but to accept the terms offered, and (3) whether the acceptance of the terms resulted from the coercive acts of the opposite party.

*McLain Plumbing,* 30 Fed.Cl. at 83 (citations omitted). The record does not support a finding of economic duress.

■ The contemporaneous evidence suggests that plaintiff voluntarily executed the waiver and release. Coastal's president wrote to the CO after reaching the agreement to express her pleasure with the resolution. Further, Coastal requested and the government executed a second modification upon the same terms and conditions for other failing cloth lots. Coastal suggests that defendant acted in a coercive manner by improperly threatening to terminate the 0419 contract for default based on inaccurate flame-resistance failures. However, plaintiff has not established that DPSC testing was performed improperly. In light of the record, the court finds that Coastal's execution of the release was neither involuntary nor the result of government coercion. The court concludes that plaintiff's claims on the 0419 contract are barred by waiver and release.

### Damages

■ Defendant's affirmative defenses bar recovery on contracts 0870 and 0419. Assuming *arguendo* that plaintiff had prevailed as to liability and had defeated the government's affirmative defenses, Coastal has not established damages with the requisite degree of certainty. The contractor bears the burden of proving the amount of its damages " 'with sufficient certainty so that the determination of the amount of damages will be more than mere speculation.' " *Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 767 (Fed.Cir.1987) (citation omitted).

■ Coastal's claims are total cost claims based on the difference between planned earned hours and actual earned hours for work on contracts between November 1986 and December 1988. The claims do not segregate specific periods of delay by individual contract. Plaintiff's plant-wide total delay approach "gives the court no basis for distinguishing costs for which the Government is responsible from costs the contractor must bear." *Dawson Construction Co. v. United States,* 225 Ct.Cl. 704, 711, 225 Ct.Cl. 704 (1980).

■ Based upon earned hours rather than calendar days, the claims are inconsistent with the contracts' performance schedules. Further, they provide no basis for converting from planned or actual earned hours to calendar days to allow a reasonable calculation of delay. Coastal never provided defendant with sufficient documentation to determine how planned earned hours were

calculated. Thus, the DCAA could not and this court cannot determine whether alleged delays had any impact on increased costs, or whether Coastal had simply underbid the contracts. Although plaintiff provided summary reports to support its actual earned hours, the reports contained unreliable information and the DCAA had little confidence in their accuracy. Moreover, Coastal failed to provide adequate evidence to support its claimed efficiency rate of 108%. Finally, the claims do not reflect any concurrent causes of delay, such as the criminal antitrust prosecution, or the reimbursement received from cloth suppliers.

The court places significant weight on the detailed audits of the DCAA. Although the DCAA confirmed some elements of Coastal's claims, the audits merely analyzed methodology, without addressing liability issues, and nonetheless concluded that plaintiff was entitled to no compensation because reimbursement from cloth suppliers exceeded the allowable recovery amount. Plaintiff has neither established that the DCAA audits were performed in error nor introduced sufficient additional evidence to enable this court to properly allocate damages. After reviewing the record relating to damages, the court finds that the determination of the amount of damages would be no more than "mere speculation," *Lisbon Contractors*, 828 F.2d at 767, even if plaintiff had established entitlement on the merits.

### CONCLUSION

For the foregoing reasons, the court holds that plaintiff is not entitled to equitable adjustments on the contracts in this case. The clerk shall enter judgment for the defendant. No costs.