**ED. ZUEBLIN, A.G., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 96–452C.

United States Court of Federal Claims.

July 2, 1999.

John Curney, Jr., San Antonio, TX, for plaintiff.

Janene M. Marasciullo, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., with whom were David M. Cohen, Director, Frank W. Hunger, Assistant Attorney General, for defendant. Laura Smith, Assistant Command Counsel, U.S. Army Corps of Engineers, Transatlantic Program, Europe, was of counsel.

### OPINION & ORDER

SMITH, Chief Judge.

This is a government contracts case involving construction of military housing at various U.S. Army bases in Germany. In sum, plaintiff alleges that, despite a settlement agreement it signed with the Contracting Officer (CO) of the U.S. Army Corps of Engineers (COE), it should be allowed to pursue further damage claims against the government. Defendant asserts the defense of accord and satisfaction, pointing to the plain language of the signed settlement agreement and therefore the irrelevance of plaintiff's arguments regarding the circumstances and intent of the parties. Defendant moves for summary judgment. For the following reasons, defendant's motion is granted in part and denied in part.

### FACTS

In 1985, the European Division of the COE issued a Request for Proposals (RFP) to design and build prefabricated housing at five sites[1] in (then) West Germany. The RFP required that certain prefabricated materials be manufactured in the U.S. and shipped to Germany on U.S. flag carriers.[2]

---

1. The sites were: (1) Mainz, Contract No. DACA 90–85–C–0458; (2) Babenhausen, No. DACA 90–85–C–0459; (3) Kitzingen, No. DACA 90–85–C– 0460; (4) Dexheim, No. DACA 90–85–C–0461; (5) Vislek/Bindlach, No. DACA 90–85–C–0462.

2. The Cargo Preference Act of 1954, 46 U.S.C. § 1241(b), states:

Zueblin A:G., a German corporation with an American subsidiary, entered a joint venture with a U.S. company, AEGIS, Inc., and submitted a bid in response to the RFP. The COE awarded the contract to this joint venture.

Under the terms of the joint venture, AEGIS was responsible for the design, manufacture, and procurement of all U.S. items and for transporting all the U.S. goods to Germany. Unfortunately, AEGIS immediately experienced financial difficulties that prevented it from even beginning its tasks under the contract and joint venture. On May 20, 1986, Zueblin notified the COE in writing that it would, of necessity, take over all of AEGIS' work. Undisputedly, Zueblin incurred unexpected costs due to AEGIS' inability to perform under the contract; for example, it had to substantially expand its U.S. subsidiary's role, and procure new contracts for shipping items from the U.S. to Germany.

To make matters worse, the shipping company that Zueblin chose, U.S. Lines, declared bankruptcy on November 24, 1986. Zueblin subsequently advised the COE that this bankruptcy would interfere with the shipping schedule and delay completion of the housing projects. On December 4, 1986, the CO denied Zueblin's request for an extension of time, because there were other U.S. carriers available. Zueblin then (in two separate letters) asked for a waiver of the contractual U.S.-flag requirement and informed the COE that it would quantify the delay occasioned by U.S. Lines' bankruptcy. This waiver was denied.

Zueblin's work under the contract had been scheduled to be completed in October 1987. Work was completed at all five German sites during 1988, and only then could Zueblin ascertain how much the delays due to AEGIS' nonperformance and U.S. Lines' bankruptcy had cost. On March 3, 1988, Zueblin sent a letter to the CO which outlined a conversion rate claim based on the fluctuations in the currencies of Germany and the United States. In October 1988, Zueblin submitted 15 claims relating to the five contracts and met with the COE to discuss its various claims for equitable adjustment. Several meetings thereafter failed to resolve the dispute between the parties.

At this point, the parties' characterization of the facts diverge. Both agree that defendant offered to settle plaintiff's claims at a November 22, 1989 meeting for a sum of 2,220,020.87 Deutsche Marks (DM) plus 22,699.35 U.S. Dollars ($). However, defendant states that the offer was a "final and global settlement that did not divide the settlement offer among the specific claims because Zueblin had asked for an 'overall settlement.'" Def.Stmt. Of Uncontrov. Facts at 5, ¶ 25. Plaintiff sees the settlement differently: "Zueblin had requested that the [CO] examine the various items and address them in one office rather than requiring Zueblin to submit 75 separate claims to different offices. It was never proposed that the disputed items would be considered only one dispute such that final settlement would be accepted to satisfy all issues ...." Pl.Stmt. Of Genuine Issues at 1–2. Specifically, although both parties agree that Zueblin's conversion rate claim was discussed during settlement nego-

---

Whenever the United States shall procure, contract for, or otherwise obtain for its own account ... any equipment, materials, or commodities, within or without the United States, or shall advance funds ... of foreign currencies in connection with the furnishing of such equipment ... the appropriate agency or agencies shall ... assure that at least 50 [percent] of the gross tonnage of such equipment ... which may be transported on ocean vessels shall be transported on privately owned United States-flag commercial vessels, to the extent such vessels are available at fair and reasonable rates.... Provided, that the provisions of this subsection may be waived whenever the Congress by concurrent resolution or otherwise, or the President of the United States or

the Secretary of Defense declares that an emergency exists justifying a temporary waiver of the provisions of this paragraph and so notifies the appropriate agency or agencies. 46 U.S.C. § 1241(b) (1988 & Cum.Supp.1997). The 1954 Act was a revision of the 1904 Cargo Preference Act, 10 U.S.C. § 2631 (1956), and "has been strictly construed to require use of the U.S. flag, and the exclusion of foreign flag vessels, to the fullest possible extent." Frank J. Costello, *Trends and Developments in U.S. Cargo Preference Laws*, 36 Fed.B.News & J. 365, 367 (1989) (citations omitted). The contract at issue in this case required that all prefabricated materials manufactured in the United States be shipped to Germany on U.S. flag carriers.

tiations,[3] defendant contends that the government's settlement offer was understood by Zueblin to preclude any future claims on the contracts.

The language of the settlement agreement reads, in relevant part:

This letter represents the final agreement between the United States Government and the firm Zueblin, closing out the [contracts] .... The basis for our discussion is your [Zueblin's] letter of March 3, 1988 requesting that. I, the Contracting Officer, review your items of "proposed dispute" and consider them in terms of one combined dispute, rather than considering each item as a separate claim for each of the five contracts.

\*\*\*

This offer is made with the understanding that no claims will be made against the United States Government on these contracts.

Pl.Appx. at 24–25. The letter was signed by the CO and by an authorized representative of Zueblin, Mr. Paul Lehmann. Eight days later, Zueblin executed the settlement, and stated in the accompanying cover letter that "it was again confirmed that with cooperative engineering spirit, final decision can be achieved on difficult contractual problems." Pl. Complaint, Exhibit A. Further, in the releases of claims that accompanied Zueblin's request for payment under the settlement agreement, Zueblin failed to specifically reserve any claims. The government made final payment to Zueblin on all five contracts in 1990.

On November 21, 1995, Zueblin submitted a certified claim for equitable adjustment concerning the five contracts at issue. Plaintiff contends that "a question of fact [exists] as to whether the claims submitted by Zueblin in its [certified claim] were the same claims presented and made a subject of the November 1989 settlement agreement." Pl. Stmt. Of Genuine Issues at 2. The basis for plaintiff's claim in 1995 was that the fluctuations in the conversion rate between the U.S.

Dollar and the German Mark, and the bankruptcy of U.S. Lines, increased plaintiff's costs under the contract, for which it is entitled to payment from the government. According to plaintiff, these claims were not and are not subject to the bilateral settlement agreement the parties reached in November 1989. On January 31, 1996, the CO rejected plaintiff's claims in writing. Plaintiff then filed its complaint in this court on July 26, 1996.

## DISCUSSION

The court must determine to what extent the 1989 settlement agreement between the parties bars its consideration of plaintiff's present claims. The first step is to decide whether, as a matter of law, there was an accord and satisfaction which covered plaintiff's current claims. If not, the court must determine whether any claims that were reserved from the settlement are legally cognizable.

### I. JURISDICTION

This court has jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491, over "any claim against the United States founded either upon the Constitution, or any Act of Congress ... or upon any express or implied contract with the United States...." 28 U.S.C. § 1491(a)(1). In the present case jurisdiction is based upon the Contracts Dispute Act (CDA), 41 U.S.C. § 601 *et seq.*

### II. ACCORD & SATISFACTION

#### A. Elements

The crux of defendant's motion for summary judgment is that the 1989 settlement agreement constituted an accord and satisfaction with respect to all of plaintiff's claims on the five contracts at issue. The parties do not dispute that the settlement agreement was entered into bilaterally and voluntarily. They do not dispute that the government offered consideration (forbearance of liquidated damages on certain portions of the

---

**3.** "After listening to Zueblin's explanation of the claim, the contracting officer advised the Zueblin representatives that the expenses set forth in the conversion rate claim were improperly labeled and that a claim for increased costs due to fluctuations in the currency exchange rate were not cognizable." Def.Stmt. Of Uncontrov. Facts at 6, ¶ 31.

contracts and payment of additional sums in marks and Dollars), the necessary "satisfaction" aspect of an accord and satisfaction.[4] They do, however, dispute both the subject matter of the accord and satisfaction and whether there was a "meeting of the minds" on that subject matter. Thus, there is a question whether the "accord" aspect of an accord and satisfaction existed as to plaintiff's claim. Defendant must show that the disputed elements of the accord and satisfaction were present in order to succeed on its summary judgment motion. *See McLain Plumbing & Electrical Serv. Inc. v. United States,* 30 Fed.Cl. 70, 80 (1993) (citing *Brock & Blevins Co. v. United States,* 170 Ct.Cl. 52, 58–59, 343 F.2d 951, 955 (1965)). "[I]f the defendant demonstrates an accord and satisfaction pertaining to the original ... contract, the plaintiff would lose the right to sue the Government for claims based upon the prior contract on the grounds of discharge." *McLain Plumbing,* 30 Fed.Cl. at 80.

### B. Meeting of the Minds

"[T]his case requires the court to rule on whether there was a meeting of the plaintiff's and the Government's minds. Without agreement, the parties did not reach an accord. This determination is a question of law." *XXX Construction Co. v. United States,* 16 Cl.Ct. 491, 498 (1989) (citing *Merritt–Chapman & Scott Corp. v. United States,* 198 Ct.Cl. 223, 230, 458 F.2d 42, 46 (1972)). The determination is a question of law because the court's task is one of contract interpretation. In this case, the court must examine the 1989 settlement agreement, and decide whether, and to what respect, the agreement represents a meeting of the minds between Zueblin and the COE.

As defendant correctly points out, "the contract modification [here, the language of the 1989 settlement agreement] represents the best source of evidence regarding intent." *McLain Plumbing,* 30 Fed.Cl. at 81. Unlike *McLain Plumbing,* though, where a recovery schedule included in the disputed contract modification "clearly define[d] the intentions of the plaintiff in submitting a proposal for alternative performance," *id.,* the 1989 settlement agreement may not stand as an independent, fully integrated agreement. *See supra* FACTS section (quoting the language of the 1989 settlement). Importantly, the 1989 settlement agreement references the March 3, 1988 letter as the "basis" for the settlement discussions that led to the agreement. In addition, the COE's Chief of New Family Housing, Robert Wolfe, who attended the November 22, 1989 meeting, memorialized those negotiations in a memorandum written two months afterwards. The memorandum sheds light upon the parties' intent. Pl. Appx. at 21–23. Defendant asserts that "there is [ ] no basis to conclude that the [CO] knew of Zueblin's intention to pursue these claims." Def. Reply at 12. The Wolfe Affidavit, however, suggests the contrary; at least one COE official was well aware of plaintiff's intentions during the settlement negotiations.

Defendant argues that nothing other than the plain language of the 1989 settlement agreement is relevant to the court's disposition of Zueblin's claim, and that any external evidence of intent is barred from consideration by the parol evidence rule. Def. Reply at 5–10. If defendant is correct on this point, the court must not use the March 3, 1988 letter or Mr. Wolfe's memorandum to decide whether accord and satisfaction existed concerning plaintiff's present claims.

"The parol evidence rule ... prevents the court from considering evidence of prior dealings, on a motion for summary judgment or otherwise, when put forth for

---

4. "At times, ... a settlement discharging a Government contract claim is improperly called a release (or vice versa)—and the problem is further confused by the fact that a 'settlement' document may also use 'release'-type language ... there has been an unfortunate tendency in the Government contract legal decisions to confuse the essentially bilateral nature of a settlement with the essentially unilateral nature of a release." *McLain Plumbing & Electrical Serv. Inc.*

*v. United States,* 30 Fed.Cl. 70, 79 n. 3 (1993) (citations omitted). In this case, the parties clearly executed a bilateral settlement. "Plaintiff's agreement to the settlement constituted the accord; the satisfaction occurred when plaintiff accepted final payment." *Spirit Leveling Contractors v. United States,* 19 Cl.Ct. 84, 92 (1989). Thus, the court must examine the law of accord and satisfaction and apply it to the instant facts.

the purpose of varying the meaning of clear, unambiguous language." *King Fisher Marine Serv. Inc. v. United States,* 16 Cl.Ct. 231, 234 (1989).[5] *See also Peterson–Sharpe Eng'g Corp. v. United States,* 6 Cl.Ct. 288, 295 (1984). Neither can parol evidence be used by a party to create contractual ambiguity. *See King Fisher,* 16 Cl.Ct. at 234.

■ However, this court has looked "at the writing, as well as the facts and circumstances (extrinsic evidence), to determine if the intent of the parties was to finally and completely integrate the agreement into the writing. This court has . . . allowed presentation at trial of all testimony or extrinsic evidence to determine the completeness of the contract in issue." *Design and Production Inc. v. United States,* 18 Cl.Ct. 168, 195 (1989) (citing Restatement (Second) of Contracts §§ 236, 240). With respect to the 1989 settlement agreement, then, it is appropriate for the court to consider the prior letter referenced on the face of the agreement, and the memorandum of the relevant settlement negotiations written by an adverse participant (to plaintiff's claim),[6] in ascertaining the intent of the parties. *See id.; David Nassif Assocs. v. United States,* 214 Ct.Cl. 407, 420, 557 F.2d 249, 256 (1977) (intent of parties to an allegedly integrated agreement can be determined from the writing itself, the con-

text of its execution, and any evidence of negotiations that led to the agreement).

### C. The March 3, 1988 Letter and Wolfe's Memorandum

■ A plaintiff's mere intent not to waive a claim when it signs a general release of claims is insufficient to raise a genuine issue of material fact to preclude summary judgment for the government. *See Progressive Bros. Constr. Co., Inc. v. United States,* 16 Cl.Ct. 549, 551–53 (1989). *See also Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1394 (Fed.Cir.1987) (claim cannot be reserved and asserted on the basis of intent alone). Plaintiff here must show something more than "subjective intent" in order to preclude summary judgment for defendant on its defense of accord and satisfaction. With respect to the "conversion rate" claim, plaintiff has provided objective evidence to demonstrate that there may have been no meeting of the minds in the settlement of claims on this issue. Thus, summary judgment is inappropriate on this issue.

The letter sent to the COE's CO, Colonel Moravec, from Zueblin on March 3, 1988 reads like a demand letter prepared in advance of the filing of a complaint. The letter assumes that "the above captioned contracts shall be adjusted to account for the change in

---

5. In *King Fisher,* plaintiff argued that a written settlement agreement executed with respect to a change order did not bar all claims concerning that change order. 16 Cl.Ct. at 233. In support of this argument, plaintiff offered two letters written to the relevant CO prior to the settlement, and one written the day after the settlement. *Id.* Plaintiff contended that these letters together established that some claims were intended to be excluded from the scope of the settlement agreement. *Id.* The court granted summary judgment to the government:

[T]he parties sat down at a bargaining table in order to settle their disagreement. They then reduced their agreement to writing, which included the release provision, . . . stating that such "modification constitutes compensation in full on behalf of the contractor . . . for all costs and markups directly or indirectly attributable to the changes ordered herein." Certainly, King Fisher could not have failed to appreciate the significance of such language within the context of the circumstances surrounding the execution of such an agreement. *King Fisher,* 16 Cl.Ct. at 237. The court found that a meeting of the minds and accord and

satisfaction existed concerning any claims arising from the relevant change order. *Id.* In Zueblin's case, the evidence neither "disprove[d] [plaintiff's] major thesis" nor failed to contain "one scintilla of probative evidence" that some claims were not included in the settlement, as did plaintiff's proffered letters in *King Fisher.* Zueblin's March 3, 1988 letter explains its "conversion rate" claim in detail. Additionally, Robert Wolfe's memorandum is probative of the "circumstances surrounding execution" of which both parties were aware. *King Fisher* is therefore distinguishable, and does not scuttle plaintiff's argument (at least with respect to the "conversion rate" claim).

6. Robert Wolfe left government employment on September 30, 1995. During the time of the contracts at issue, he was Chief, New Family Housing (Construction Division), U.S. Army Corps of Engineers, project manager for the European Division executive office, and "was involved in ongoing contract modifications and various legal actions." Wolfe Affidavit at 1; Pl. Appx. at 31.

value of the U.S. Dollar relative to the German [Mark]," and states that the matter has been discussed with legal counsel. Pl.Appx. at 13. It then asserts that "the parties structured the above-captioned agreements with the express intention of insulating the [Zueblin/AEGIS joint venture] from any changes in the U.S. Dollar–German DM exchange rate." *Id.* The remainder of the letter explains this assertion, concluding that "[t]he fact that the EUD willingly exposed itself to any fluctuations in the exchange rates suggests that the EUD believed in the stability of exchange rates and relied upon its belief in drafting the Joint Venture's contracts." Pl. Appx. at 16. Attached to the letter is a "Summary of Estimated Expenses in German Deutsche Marks for which U.S. Dollars Are Received." *Id.* at 17.[7]

Wolfe's memorandum of the November 22, 1989 negotiations specifically references the claims asserted in the March 3, 1988 letter. "The [CO] accepted the letter and asked for an explanation of these items. Zueblin explained that after contract award several items in the construction were changed by EUD from U.S. items to German items and these items caused an increase in the cost of construction to Zueblin that was not in their proposal or contract." Pl.Appx. at 22. After a break in the negotiations, "[w]hereas Zueblin had now proposed DM 4,640,000 for 'Conversion Rate,' or more accurately labelled 'source of origin changed,' the [CO] was prepared to offer a net sum of DM 718,562.... The [CO] elected to ignore the item called 'Conversion Rate' completely and offer instead some recognition of the 'Overinspection' item. He recognized that this item was a sore point for the firm Zueblin and felt that his offer would be more readily accepted." *Id.* at 23. Finally, Wolfe noted that "this final settlement includes all pending modifi-

cations with the exception of the modification at Kitzingen for additional temporary power, and it includes the subtraction from the settlement for the assessed liquidated damages at Kitzingen and Vilseck." *Id.*

There is objective evidence in the record that the conversion rate claim was expressly excluded from the settlement agreement. "[A] settlement will not bar disputed claims which were not considered by the contractor and the government." *United Int'l Investigative Serv. v. United States,* 33 Fed.Cl. 363, 368 (1995), *rev'd on other grounds,* 109 F.3d 734 (Fed.Cir.1997). *See Coastal Industries Inc. v. United States,* 32 Fed.Cl. 368, 375 (1994) (charging a CO with a subordinate employee's knowledge of plaintiff contractor's intent to pursue a claim where an officer of the plaintiff corporation informed the subordinate of its intent to file a claim; such knowledge by the government precluded the final payment to the contractor from barring its claim); *Tri–O Inc. v. United States,* 28 Fed.Cl. 463, 471–72 (1993) (settlement and issuance of final payment constitutes accord and satisfaction only as to the claims considered during the settlement negotiations).

The March 3, 1988 letter and the Wolfe memorandum are significant evidence that there was no meeting of the minds on the conversion rate claim. Colonel Moravec, however, submitted an affidavit which conflicts with both Mr. Lehmann and Mr. Wolfe concerning of plaintiff's claims.[8] Col. Moravec states that "I advised Zueblin during the November 22, 1989 meeting that this offer included settlement of Zueblin's claim for damages allegedly caused by the exchange rate between the U.S. Dollar and the German mark and all other claims associated with the five contracts." Moravec Affidavit ¶ 9.

---

7. By letter of August 21, 1989, Zueblin told the COE that its March 3, 1988 letter "hereby is officially withdrawn. We do, however, reserve our right to further pursue [the subject of the fluctuating exchange rate] as a claim under the contracts." This is further evidence that the currency exchange rate claim was not considered settled by the settlement agreement, and that defendant was aware of this fact.

8. Plaintiff raises a technical objection to the Affidavit of Colonel Moravec based on authentication and hearsay concerns because the document does not state that Colonel Moravec has personal knowledge of the facts contained therein, although he was CO for Zueblin's five contracts. Defendant filed an amended Affidavit which included a statement from Colonel Moravec that he had such knowledge. *See* Def. Reply at 2 n. 1 and attached Appx. at 1. The court, accordingly, rejects the objection.

Based on the March 3, 1988 letter and the Wolfe Memorandum, as well as the conflicting affidavits of Wolfe and Colonel Moravec (the CO), the court requires fact finding to determine whether there was a meeting of the minds with respect to the "conversion (or currency) rate" claim, and whether the 1989 settlement agreement constituted an accord and satisfaction on that claim.[9] Accordingly, trial is necessary to decide whether the conversion rate claim was settled by the agreement.

■ The claim based on increased costs due to the bankruptcy of U.S. Lines is less well-grounded in the record. The letter to Colonel Moravec from Zueblin on March 3, 1988 mentions nothing about the bankruptcy of U.S. Lines or any costs Zueblin incurred as a result. Plaintiff's main evidence is the Affidavit of Robert Wolfe, who avers that "the November 22, 1989 meeting was not intended to address or resolve Zueblin's claims regarding AEGIS and USL. Zueblin's claims regarding AEGIS and USL were not presented at the meeting, as indicated by the Memorandum For Negotiations." Wolfe Affidavit ¶ 16; Pl.Appx. at 33. Zueblin's Director of the Overseas Division, Paul Lehmann, corroborates this characterization of the settlement negotiations, and states further that Mr. Wolfe informed the company in 1987 that "there was no viable claim for our damages" due to USL's bankruptcy and the increased costs Zueblin incurred. Lehmann Affidavit ¶¶ 12–14; Pl.Appx. at 36. Wolfe's Affidavit is in agreement with the latter statement. Wolfe Affidavit ¶ 10 ("The COE was aware of Zueblin's intent [to pursue the USL claim] because I was instructed to inform Zueblin that their claim could not be maintained."); Pl.Appx. at 32.[10]

The situation is analogous to that in *Coastal Industries Inc. v. United States*, 32 Fed. Cl. 368 (1994). There, the court found as a result of one of plaintiff's officers' testimony that she informed a government employee about her intent to file a claim on one of several contracts prior to final payment on that contract, that the government's final payment did not bar plaintiff's claim on that contract.[11] 32 Fed.Cl. at 375. The court concludes that the settlement agreement executed on November 22, 1989 does not represent an accord and satisfaction concerning Zueblin's claim for increased costs due to USL's bankruptcy. This makes the issue inappropriate for summary judgment.

## III. THE CONTRACT TERMS

Defendant's inability to show that an accord and satisfaction occurred with respect to plaintiff's conversion rate and shipping cost claims at the summary judgment stage does not necessarily allow plaintiff to recover. The court must examine the merits of these claims to determine whether or not they are legally cognizable. "If there are no claims excepted on the release *or if the claims are not legally cognizable as claims,* then the final payment [to the contractor] will act as a bar to their subsequent submittal on the basis of the release signed by the contractor." *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987) (emphasis added).

Zueblin claims the following:

The fact that Zueblin was required to assume AEGIS' scope of work caused Zueblin to incur financial loss which they would not have otherwise incurred. The contracts were divided into a U.S. Dollar portion of work and payment (covering the

---

**9.** If no meeting of the minds took place concerning a claim, accord and satisfaction has not occurred with respect to that claim. *XXX Construction,* 16 Cl.Ct. at 498.

**10.** In response to this evidence, defendant repeats that "Zueblin cannot now rely upon parol evidence in the form of declarations to overcome the plain terms of the agreement." Def. Reply at 7 (citing *King Fisher,* 16 Cl.Ct. at 234).

**11.** In *Coastal Industries,* the court found that "in July 1988, [Coastal's president] informed an em-

ployee of Defense Contract Operations of Coastal's intent to file a claim. Coastal's contract administrator, who was also present during the conversation, corroborated the testimony." 32 Fed.Cl. at 375. In this case, Zueblin's Mr. Lehmann corroborates the testimony of the then-COE employee Mr. Wolfe that the parties understood the USL bankruptcy issue to be unsettled prior to and during the relevant settlement negotiations (although this is disputed by Colonel Moravec's testimony).

manufacture and transportation of supplies from the U.S. to Europe) and a German Mark portion of work and payment (covering the execution of the work in Germany). Zueblin neither knew nor could have known that exposure to currency exchange fluctuations was a risk they would be assuming under the contract. Payments were made in each currency as stated in the schedule of values. Once Zueblin started performing AEGIS' scope of work, they were automatically exposed to drastic changes in the exchange rate between the U.S. Dollar and the German Mark. During the course of the project, the U.S. Dollar fell in value ... [t]he total amount claimed for this issue is DM 14,590,501.00.

Pl. Complaint ¶ 16. The court must decide whether, given the nature and language of the contracts at issue, and any applicable case law, Zueblin can maintain these claims.

A. Currency Exchange Rate Claim

■ Plaintiff argues that its contract with the COE explicitly or implicitly allocated the financial risks of fluctuations in the exchange rate between the U.S. Dollar and German Deutsche Mark to the government. The court must examine the relevant contract language to determine the merits of this contention.[12]

First, a standard government Form 1442 was incorporated into each of the five site contracts. On the forms, the stipulations that "Dollar amounts will be for costs incurred in U.S. and transportation" and "DM amounts will be for costs incurred in the Federal Republic of Germany" were typed in next to the lump sum figures. See, e.g., Def.Resp. to Court Order to Supplement Record, Exh. A (Mainz contract).

The Request for Proposals (RFP) sent out by the COE stated (in a section titled "Cost Limitations") that "[o]ffers can be in Dollars, Deutsche Marks or a combination thereof. For evaluation purposes, Deutsche Marks will be converted at the rate of 3.00 Deutsche Marks per Dollar." Id. at Exh. D, Bates # 001056. In the Price Proposal Schedules subsequently sent by Zueblin to the COE on May 14, 1985, the proposed amounts were broken into two separate columns (U.S. $ + DM); nothing indicates any provision for adjustment of currency exchange rates.

Special Clause SC–30B, incorporated in all of the actual contracts, stated that contractor requests for payment for expenditures made in the United States "may be expressed either as dollar amounts or as percentages applicable to the total amount of the request for payment." Contract Tab 3, Bates # 002813. Standard Clauses 22 (Payments Under Fixed–Price Construction Contracts) and 54 (Modification of Proposals—Price Breakdown) relate to the conditions of payment by the government to the contractor, and the manner in which a contractor must present price proposals for modifications. Neither contemplates any adjustments for exchange rate fluctuations. See Contract Tab 4, Bates # 002838, 002871–72.

Finally, in the Joint Venture agreement between plaintiff and AEGIS (to which the contracts were formally awarded), the parties stipulated to an exchange rate of three Marks to one Dollar in fixing the "amount of each Party's Scope of Work." JV Agmt., Article 4, Bates # 000595. The parties also agreed that "[t]he above amounts [listed in Dollars and DM] may from time to time be adjusted in order to reflect additions or deductions to the Scope of Work of each Party resulting from change orders issued by the Client [the government] or by mutual agreement of the Parties...." Id. Article 3 of the Agreement provided that "[e]ach Party is solely responsible for the performance of its Scope of Work and bears all the financial and technical risks of its Scope and any and all liabilities that may arise in connection therewith unless specifically provided otherwise herein." Id., Article 3, Bates # 000595. Article 14 further contemplates payment by the government in both Dollars and DM, and holds each party "solely responsible for all costs and expenses incurred by it in connec-

---

12. In response to this court's order, the parties provided complete or substantially complete copies of all five contracts, divided into tabbed sections. For citation purposes, and unless a specif- ic site is referenced, contract provisions cited will be referred to by Tab number and Bates Stamp number.

tion with (I) the Tender submitted to the Client and (II) any acts or things arising from the Contract for the Project." *Id.,* Article 14, Bates # 000601.

■ The contract language provides no support to plaintiff's general claim that the COE contracts were structured to insulate them from the financial risks of fluctuations in the currency exchange rates. The contracts were specifically structured, however, to provide for payments in Dollars for U.S. components, and for payments in DM for German components. If, as plaintiff explained during the November 22, 1989 settlement negotiations, "after contract award several items in the construction were changed by EUD from U.S. items to German items and these items caused an increase in the cost of construction to Zueblin that was not in their proposal or contract," plaintiff may have a valid, contract-based claim for reimbursement. *See* Pl.Appx. at 22 (Memorandum for Record of Negotiations). "Mr. Wolfe, as Chief of Family Housing, Construction Division, verified that the items discussed were, in fact, changed by EUD during the design phase ... Zueblin stated that DM 4,640,000 was their proposal for these items...." *Id.*

Though these statements during the settlement negotiations do not, by themselves, establish plaintiff's entitlement to any amount of equitable adjustment, they do set forth enough evidence of the COE's departure from the terms of the contract to preclude summary judgment for the government on the claims for the increased costs of items whose "source of origin" was changed.[13] Accordingly, only plaintiff's general and specific claims concerning entitlement to an equitable adjustment based on fluctuations in the Dollar–DM exchange rate are denied. The change in "source of origin" claim, however, survives.[14] The government's motion for summary judgment on this claim is denied.

**B. Claim for Increased Shipping Costs Based Upon USL's Bankruptcy**

■ In contrast to the "source of origin" claim, plaintiff's claim for an equitable adjustment based upon increased shipping costs has no contractual foundation. Essentially, plaintiff argues that the COE should have granted it a waiver from the strictures of the Cargo Preference Act and allowed Zueblin to use any available shipper once USL proved unable to fulfill its obligations. The COE granted no such waiver, and plaintiff was "forced to use a U.S. flag carrier in shipping the material to Germany." *See* Pl. Resp. at 7.

Plaintiff was not forced to sign the contracts it signed with the COE, all of which included Standard Clauses 43 (Preference for Privately Owned US–Flag Commercial Vessels) and 58 (Ocean Transportation of Government Owned Supplies). Clause 43 stated

---

**13.** If plaintiff established that the COE failed to make an equitable adjustment to account for the "source of origin" changes and resulting increased costs to Zueblin, the government may have run afoul of Standard Clause 39 (Changes) of the contracts. Specifically, subsection (d) of Clause 39 states that "[i]f any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing." Def.Resp. to Court Order to Supplement Record, Exh. B, Bates # 001975. Subsection (f) of Clause 39 states that "[n]o proposal by the Contractor for an equitable adjustment shall be allowed if asserted after final payment under this contract." The claim for "source of origin" changes, however, was asserted prior to final payment, and no accord and satisfaction was reached with respect to the claim. Subsection (f) does not bar plaintiff's pursuit of the specific, legally cognizable claim based upon "source of origin" changes.

**14.** The relevant case law suggests that a claim similar to plaintiff's, based on currency exchange rate fluctuations can only succeed if the contract contains specific language. *See Truong Xuan Truc v. United States*, 212 Ct.Cl. 51, 1976 WL 905 (1976) (granting plaintiffs no additional recovery on a contract subsequent to final payment from the government where the "official exchange rate" allowed the government to pay its contract debt in foreign currency worth far fewer Dollars than it had been when the contract was signed); *Appeals of Yukong, Ltd.*, ASBCA No. 27666, 87–1 BCA (CCH) ¶ 19,393, 1986 WL 20407, at *98–99 (1986) ("In the absence of some clause in the contract, or, of course, some statutory requirement, the contract price may not be adjusted to compensate a contractor for the escalation of costs because of currency fluctuations. Neither, of course, can the Government be compensated if the fluctuation is such as to harm its interest.").

that "the Contractor shall use privately owned US-flag commercial vessels to the extent that such vessels are available at rates that are fair and reasonable for privately owned US-flag commercial vessels." Contract, Tab 4, Bates # 002395. Subsection (b) provided that "the contract price shall be equitably adjusted to reflect the difference in cost" if shipping was not available on a U.S. carrier at reasonable rates and the Contracting Officer gave permission to ship on a non-U.S. carrier. *Id.* Clause 58 stated that government property "shall subsequently be transported only on United States-flag vessels as directed by the Contracting Officer." Contract, Tab 4, Bates # 002410.

Whether or not the COE's exercise of discretion was unfair from plaintiff's point of view, is irrelevant as such discretion was specifically granted by the contracts and was pursuant to the Cargo Preference Act. Thus, plaintiff's claim for increased costs due to USL's bankruptcy and its subsequent "forced" use of another US-flag carrier is in direct contrast with these provisions. The court cannot and should not rewrite these contracts. Although preserved despite the settlement agreement, Zueblin's claim for equitable adjustment due to increased shipping costs is not based on any legal right. Defendant is entitled to summary judgment on this claim.

### CONCLUSION

Defendant's Motion for Summary Judgment is GRANTED with respect to plaintiff's claims for equitable adjustments due to (1) fluctuations in the currency exchange rate between the U.S. Dollar and German Deutsche Mark; and (2) increased shipping costs occasioned by the bankruptcy of U.S. Lines and the requirement to use US-flag carriers to transport goods from the U.S. to Germany. Defendant is DENIED summary judgment on plaintiff's contractually-based claim that it is due an equitable adjustment based on "source of origin" changes made by the government.

It is so ORDERED.